*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID HALSTEAD,

        Plaintiff-Appellant,

v

CITY OF FLINT and BOARD OF TRUSTEES OF THE CITY OF FLINT RETIREMENT SYSTEM,

        Defendants-Appellees,

MUNICIPAL EMPLOYEES RETIREMENT SYSTEM,

        Plaintiff-Appellee,

v

DAVID HALSTEAD,

        Defendant-Appellant.

UNPUBLISHED
May 20, 2021

No. 351658
Genesee Circuit Court
LC No. 17-108507-CZ

No. 351659
Genesee Circuit Court
LC No. 17-110138-CZ

Before: SHAPIRO, P.J., and JANSEN and BECKERING, JJ.

PER CURIAM.

In these consolidated cases, David Halstead appeals the trial court's opinion and order granting summary to the City of Flint (the city), the Board of Trustees of the City of Flint

-1-

Retirement System (the FERS Board of Trustees), and the Municipal Employees Retirement System (MERS).[1]  We affirm.

## I. BACKGROUND

The trial court succinctly set forth the background to this case:

> This case involves an administrative appeal by Halstead, a firefighter employed by the City of Flint until he retired due to disability in 2007.  Between Halstead's retirement and his bringing this matter before the Court, the city of Flint was put under the control of an Emergency Manager, who was charged with dealing with Flint's fiscal crisis.  As part of those efforts, [in 2012] FERS was dissolved and its pension responsibilities were transferred to MERS.[2]  A Memorandum of Understanding acknowledging the transfer from FERS to MERS was signed by the City of Flint and Flint Fire Fighters Local 352, the union that represented Halstead in contract negotiations.

> [In 2016,] Halstead, believing that he was entitled to a recalculation of his pension due to his turning 55 years old, requested information about the recalculation from MERS and was informed that he did not qualify.  Halstead claimed this determination was in error, leading the City of Flint to request a Declaratory Ruling by MERS stating that Halstead was not eligible for recalculation.  Halstead objected to that request in writing and at a preliminary hearing before an Administrative Law Judge, who stayed the proceedings in order to clarify what appellate process was due to Halstead in determining his eligibility for recalculation.  Halstead brought suit against FERS, seeking specific performance of the appellate process used by FERS before it was dissolved.[3]  MERS, having attempted to intervene in that case unsuccessfully, brought a separate suit seeking declaratory relief.  The two cases were consolidated . . . .

Halstead moved for summary disposition under MCR 2.116(C)(9) (failure to state a defense) and (10) (no genuine issue of material fact), arguing that: the emergency manager did not have authority to transfer the retirement system to MERS; the alleged transfer was never fully

---

[1] In Docket No. 351658, Halstead challenges the portion of the trial court's opinion and order granting summary disposition to the defendants in LC No. 17-108507-CZ, the city and the FERS Board of Trustees.  In Docket No. 351659, Halstead, a defendant in LC No. 17-110138-CZ, appeals the portion of the same order granting summary disposition in favor of plaintiff MERS.

[2] MERS is an independent statutory public corporation that was created to act as trustee of the money and assets of retirements systems of its member municipalities, as provided in its enabling statute, MCL 38.1501 *et seq*.

[3] Halstead subsequently filed a four-count first amended complaint against the city and the Board of Trustees, alleging a claim for breach of contract, a claim under the Michigan Constitution, and a claim under the Contracts Clause of the United States Constitution.  He sought declaratory and injunctive relief.

completed; any transfer of the retirement system amounted to a breach of contract; and Halstead's rights under the state and federal constitutions were violated. The city, the FERS Board of Trustees, and MERS responded to Halstead's motion and filed their own cross-motions for summary disposition under MCR 2.116(C)(10). Following a hearing, the trial court issued an opinion and order denying Halstead's motion for summary disposition and granting the motions for summary disposition of the city, the FERS Board of Trustees, and MERS. After the trial court denied Halstead's motion for reconsideration, these appeals followed.

## II. ANALYSIS

At the time of Halstead's retirement, the collective bargaining agreement (CBA) between his union and the city provided that the FERS Board of Trustees would determine all questions regarding retirement benefits and would hold a hearing to determine any dispute concerning benefits. Halstead maintains that he is entitled to this dispute resolution process, even though FERS has not existed for years following the transfer of the city's retirement system to MERS. For the reasons stated in this opinion, we affirm the trial court.[4]

## A. 2011 PA 4

Halstead first argues that the trial court erred by concluding that the emergency manager had authority to transfer or authorize the transfer of the retirement system from FERS to MERS under the Local Government and School District Fiscal Accountability Act, MCL 141.1501 *et seq.*, 2011 PA 4.[5]

An emergency manager's "responsibilities and authority under 2011 PA 4 are listed in former statutory provisions MCL 141.1515 through MCL 141.1530." *Kincaid v Flint*, 311 Mich App 76, 88; 874 NW2d 193 (2015). 2011 PA 4 granted emergency managers "broad powers broad

---

[4] A trial court's decision to grant or deny summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Summary disposition is properly granted under MCR 2.116(C)(10) when there is no genuine issue of material fact and one party is entitled judgment as a matter of law. We also review de novo questions of statutory interpretation. See *Honigman Miller Schwartz & Cohn, LLP v Detroit*, 505 Mich 284, 294; 952 NW2d 358 (2020). The goal when interpreting statutes is to give effect to the Legislature's intent. *Mich Ass'n of Home Builders v Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). "Statutory language should be construed reasonably, keeping in mind the purpose of the act." *People v Zitka*, 325 Mich 38, 49; 922 NW2d 696 (2018) (quotation marks and citations omitted). We also review de novo the interpretation of ordinances, *Garrett v Washington*, 314 Mich App 436, 450; 886 NW2d 762 (2016), contracts, *Lueck v Lueck*, 328 Mich App 399, 404; 937 NW2d 729 (2019), and questions of constitutional law, *AFT Mich v Michigan*, 497 Mich 197, 209; 886 NW2d 782 (2015).

[5] PA 4 took effect on March 16, 2011. It was suspended effective August 8, 2012, when the Board of State Canvassers certified petitions seeking a referendum on the Act. 2011 PA 4 was then rejected by a majority of the electors in the November 2012 general election. *Martin v Murray*, 309 Mich App 37, 40-41; 867 NW2d 444 (2015).

powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government . . . ." MCL 141.1515(4). Upon appointment, the authority of the mayor and city council were suspended and vested in the emergency manager. See MCL 141.1519(2).[6]

In this case, the parties focus on MCL 141.1519(1), which provided that "an emergency manager may take 1 or more of the following additional actions with respect to a local government which is in receivership," beginning with the authority to "[a]nalyze factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition." MCL 141.1519(1)(a). Relevant to this case, the emergency manager was also authorized to "remove 1 or more of the serving trustees of the local pension board" if the pension fund was not actuarially funded at a level of 80% or more, MCL 141.1519(1)(m), and to appoint new members to a board, MCL 141.1519(1)(ff). MCL 141.1519(1)(dd) allowed the emergency manager to "[e]xercise solely, for and on behalf of [the city] all other authority and responsibilities of the . . . governing body concerning the adoption, amendment, and enforcement of ordinances." And under MCL 141.1519(1)(y), the emergency manager had authority "[e]nter into agreements with other . . . entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities."

On May 9, 2012, while 2011 PA 4 was in effect, the financial advisor to the emergency manager notified the FERS Board of Trustees of a potential restructuring of FERS, with the intention being that the retirement system would be transferred to MERS. On June 26, 2012, the FERS Board of Trustees declined to approve a resolution transferring the city's retirement system to MERS. On June 27, 2012, the emergency manager signed two separate resolutions removing two members of the FERS Board of Trustees, and appointing two new members in their place. On July 11, 2012, the emergency manager enacted Ordinance 3823, which authorized the FERS Board of Trustees to "transfer . . . the retirement system, and . . . the related plans, programs, and funds provided for in this article, to the Municipal Employees Retirement System of Michigan," and instructed the city's finance director to take steps to implement the transfer if necessary. After the FERS Board of Trustees passed a resolution on July 19, 2012, to transfer the retirement system to MERS, on August 2, 2012, the city and the Board entered into a membership agreement with MERS, with the emergency manager signing the document on behalf of the city and the retirement system.

Halstead does not dispute that the city's pension fund was not actuarially funded at a level of 80% or more and that the emergency manager was therefore authorized to remove members from the FERS Board of Trustees, MCL 141.1519(1)(m), and replace the trustees with new members, MCL 141.1519(1)(ff). Nor does he dispute that the emergency manager had authority under MCL 141.1519(1)(dd) to enact ordinances. Nonetheless, Halstead argues that 2011 PA 4 did not grant the emergency manager specific authority to transfer the retirement system to MERS

---

[6] The emergency manager was also authorized to "[t]ake any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government." MCL 141.1519(1)(ee).

or to authorize FERS to make that transfer. Relying on *Kincaid*, 311 Mich App 76, Halstead essentially argues that every action taken by an emergency manager must be specifically authorized by 2011 PA 4 to be valid. We conclude that Halstead reads *Kincaid*'s holding too broadly.

In *Kincaid*, the plaintiff challenged the city defendant's actions in raising the water and sewer rates in September 2011 prior to the appointment of an emergency manager as well as the emergency manager's ratification of those increases following his appointment. *Id*. at 82-83. We agreed with the plaintiff that the 2011 water and sewer rate increases were invalid because they were not published and noticed at least 30 days prior to implementation as required by ordinance. *Id*. at 82-86. The next question was whether the emergency manager "was granted the authority to ratify the unauthorized acts of another public official . . . ." *Id*. at 86-87. We concluded that 2011 PA 4 did not grant the emergency manager the power to ratify unauthorized acts taken before his appointment. *Id*. at 87-89. Our conclusion rested on the fact that 2011 PA 4 contained a provision specifically dealing with the question of ratification and provided for ratification only as to prior actions of the governor, the state treasurer or a review team acting under prior law and did not provide authority for the emergency manager to ratify actions of the local authorities taken before his appointment. See *id*. at 88-89; MCL 141.1512(6).[7] The city defendant in *Kincaid* also argued that ratification was authorized by MCL 141.1519(1)(a), but we rejected that this provision authorized ratification because the rate increases were not *initiated* by the emergency manager. *Id*. at 90-91. Accordingly, the emergency manager's order did not rectify the pre-appointment unauthorized rate increases. *Id*. at 91.

While *Kincaid* reinforces that the emergency manager's power and authority derive solely from the enabling legislation, it did not hold that emergency managers lack the power of ratification simply because that authority was not specifically conferred by 2011 PA 4. Rather, it was clear in that case that the Legislature did not intend to grant the power of ratification to the emergency manager given that the statute specifically providing for ratification limited that authority to certain persons and entities.[8] Although there must be statutory authority for an action taken by an emergency manager, that authority may nonetheless stem from the broader powers listed in 2011 PA 4, absent legislative intent to the contrary. Halstead's narrow interpretation of an emergency manager's authority would, in effect, render the general powers contained in the Act nugatory. See *Kondzer v Wayne Co Sheriff*, 219 Mich App 632, 638; 558 NW2d 215 (1996) ("[T]his Court must construe the statute in harmony with the legislative purpose, and avoid any construction that would render any part of the statute surplusage or nugatory.") (citations omitted).

---

[7] The successor act, 2012 PA 436, contained a substantially similar provision, but added "the superintendent of public instruction" and "the local emergency financial assistance loan board" to the list of those whose actions are or may be ratified. *Kincaid*, 311 Mich App at 89; MCL 141.1544(6).

[8] In other words, the language of the statute makes clear that the Legislature knew how to confer the power of ratification and had it wished to provide that power to emergency managers it could have done so. See *Farish v Dep't of Talent and Econ Dev*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 350866); slip op at 8.

In this case, the emergency manager evaluated the respective investment performances of FERS and MERS, and their respective costs of administration and managing investments, and determined that transferring the retirement system to MERS would offer significant cost savings for the city. The emergency manager then took steps to initiate the transfer of FERS to MERS. In other words, the emergency "[a]nalyze[d] factors and circumstances contributing to the financial emergency of the local government and initiate[d] steps to correct the condition." MCL 141.1519(1)(a). Moreover, pursuant to MCL 141.1519(1)(dd), the emergency manager enacted Ordinance 3823, which authorized the FERS Board of Trustees to transfer the retirement system to MERS. Further, the emergency manager had authority under MCL 141.1519(1)(y) to enter into a membership agreement with MERS.

Considering the various grants of statutory authority discussed above, we are satisfied that 2011 PA 4 provided the emergency manager with authority to take necessary actions to facilitate the transfer of the retirement system to MERS.[9]

## B. TRANSFER OF THE RETIREMENT SYSTEM TO MERS

Halstead next argues that the trial court erred by concluding that the transfer of the retirement system to MERS was fully effectuated and completed.

Halstead maintains that there is a discrepancy between Ordinance 3823 and the July 19, 2012 resolution that shows that the FERS Board of Trustees did not intend to transfer the retirement system in its entirety to MERS. While Ordinance 3823 granted the FERS Board of Trustees the authority to "transfer . . . the retirement system, and . . . the related plans, programs, and funds provided for in this article, to [MERS]," the subsequent resolution approved by the Board "authorized the . . . transfer [of the retirement system] to MERS," but did not refer to the plans, programs and funds referenced in the ordinance. According to Halstead, the July 19, 2012 resolution therefore reflects an intention to only transfer the funds of the retirement system and the management of the funds, and not the hearing functions of the FERS Board of Trustees to MERS. Halstead also relies on deposition testimony that city employees still provide MERS with information regarding retirees and review final calculations by MERS for accuracy.

We find the trial court's analysis of this issue well-reasoned and adopt it as our own:

---

[9] Halstead makes a cursory claim, unsupported by any meaningful legal argument or citation to authority, that the emergency manager's actions under 2011 PA 4 were required to be reapproved to remain effective once the law was repealed. However, in *Pontiac Police & Fire Retiree Prefunded Group Health & Ins Trust Bd of Trustees v City of Pontiac No. 1*, 309 Mich App 590, 601-602; 873 NW2d 121 (2015), rev'd in part and vacated in part on other grounds 499 Mich 921 (2016), we concluded that "if the EM validly acted pursuant to the authority of 2011 PA 4 to amend existing CBAs . . . , then that action remains valid and enforceable despite the subsequent repeal by referendum of the act." Given *Pontiac Police*, we disagree with Halstead's contention that the actions of the emergency manager relating to the retirement system were no longer valid once 2011 PA 4 was suspended and then later repealed.

While the language in Ordinance 3823 is somewhat different from the language in the July 19th resolution, it is plain from the overall transfer process and the documents signed by the City of Flint and MERS that the FERS Board did not intend to reserve the right to hear benefits appeals. *There is no language in any resolution or ordinance expressly stating that the FERS Board intended to remain in existence for the purpose of deciding benefit appeals*. The obvious intent from the resolutions and ordinances in question was to dissolve the FERS Board and transfer its duties to MERS. The fact that City of Flint employees are still involved in providing financial information about retirees to MERS does not change this analysis, as MERS still makes the final decision on benefits for retirees. As such, the transfer from FERS to MERS was a complete transfer of all pension responsibilities. [Emphasis added.]

Ordinance 3823, the July 19, 2012 resolution and the subsequent agreements clearly establish that MERS is now solely responsible for the administration of the retirement system. Indeed, FERS no longer exists and its functions were completely subsumed by MERS when the retirement system was transferred.

For these reasons, there is no merit to the proposition that FERS and the city did not intend to transfer the hearing functions of FERS to MERS.[10]

## C. BREACH OF CONTRACT

Halstead also argues that the trial court erred by dismissing his breach-of-contract claim, which is premised on Halstead's theory that the transfer of the retirement system amounted to a breach of the CBA in effect at the time of Halstead's retirement. The gravamen of Halstead's argument on appeal is that, because the CBA provided that FERS would manage his pension and the concomitant administrative procedures, he had a vested contractual right to have hearings before the FERS Board of Trustees that could not be altered without his consent.

To prevail on a breach-of-contract claim, Halstead must establish the following elements: "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller Davis Co v Ahrens Constr, Inc*, 495 Mich 165, 171; 848 NW2d 95 (2014). "Under established contract principles, vested retirement rights may not be altered without the pensioner's consent." *Allied Chem & Alkali Workers of America v Pittsburgh Plate Glass Co*, 404 US 157, 160; 92 S Ct 383l 30 L Ed 2d 341 (1971).

As an initial matter, we note this case does not concern retirement benefits, but rather the administrative procedure governing those benefits, and so we question the applicability of caselaw relating to vested retirement benefits. Setting that aside, we conclude that Halstead did not have a

---

[10] While Halstead appears to be correct that the applicable ordinances and FERS plan documentation were not amended to reflect the transfer of the retirement system to MERS, this does not detract from the language of the ordinance, resolution, and agreements that clearly reflect an intention to transfer the retirement system, together with any related plans, programs, and functions, to MERS.

vested, unalterable right to have FERS decide his request to have his pension recalculated. While the CBA "vested" the general administration of the retirement system in the FERS Board of Trustees, it did not state that this was to continue in perpetuity or beyond the duration of the CBA. "[W]hile 'a collective-bargaining agreement may provide in explicit terms that certain benefits continue after the agreement's expiration[,] . . . when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Kendzierski v Macomb Co*, 503 Mich 296, 325; 931 NW2d 604 (2019), quoting *M & G Polymers USA, LLC v Tackett*, 574 US 427;135 S Ct 926, 937; 190 L Ed 2d 809 (2015). Under these circumstances, "the only reasonable interpretation of the CBA[] is that [the contractual right] expired when the CBA[] expired." *Kendzierski*, 503 Mich at 325 (holding that the CBAs in that case did not grant a vested right to lifetime and unalterable retirement healthcare benefits). Because Halstead did not have a vested right to have his pension administered by FERS, this provision of the CBA was subject to modification, which occurred when Halstead's union and the city entered into a memorandum of understanding on July 31, 2012. The memorandum of understanding provides that the union expressly agreed to transfer of the retirement system to MERS, including "the administration, operation, management programs and funds of the Retirement System . . . ." And it is well-settled under Michigan law that a bargaining agent has the authority to bind the members of its bargaining unit. *Kempner v Local 2077*, AFL-CIO, 126 Mich App 452, 462 n 3; 337 NW2d 354 (1983). Therefore, Halstead's claim that the transfer of the retirement system violated a vested contractual right is without merit. Accordingly, the trial court did not err by dismissing Halstead's claim for breach of contract.

## D. CONSTITUTIONAL CLAIMS

Halstead next argues that the trial court erred by dismissing his claims alleging violations of the Contract Clauses of the Michigan and United States Constitutions and the Takings Clause of the Michigan Constitution.

## 1. CONTRACT CLAUSES

"Both the Michigan and United States Constitutions prohibit laws that impair obligations under contracts." *AFT Mich v Michigan*, 497 Mich 197, 232-233; 866 NW2d 782 (2015). See also Const 1963, art 1, § 10; US Const, art 1, § 1. "These clauses provide that vested rights acquired under a contract may not be destroyed by subsequent state legislation." *Aguirre v Michigan*, 315 Mich App 706, 715; 891 NW2d 516 (2016) (quotation marks and citations omitted).

As discussed, we conclude that Halstead did not have a vested right to have his pension be administered by FERS. There is nothing in the relevant language of Halstead's CBA that indicates that the union and the city intended that the access of union members to the administrative processes offered by FERS was unalterable and could not be modified or changed in any manner. Accordingly, Halstead's claims alleging violations of the Contract Clauses fail because he cannot demonstrate that the transfer of the city's retirement system to MERS impaired a vested contractual right.

Even assuming Halstead had a vested right, we agree with the trial court that he has not shown a substantial impairment of a contractual relationship. To determine whether the Contract Clause has been violated, "courts apply a three-pronged balancing test, with the first prong being

a determination whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id*. (quotation marks and citation omitted). Halstead argues that his contractual right has been substantially impaired because a hearing before FERS was akin to trial by jury of his peers as it included other retirees, whereas a hearing before MERS is more like a bench trial before a judge. Yet the appeals process provided by MERS arguably provides greater procedural due process. Unlike the appeal process under FERS, if a retiree's claim is denied by MERS, the retiree may request a hearing before an Administrative Law Judge in accordance with the Administrative Procedures Act, MCL 24.201 *et seq*. The ALJ then issues a proposed decision and both sides may file exceptions and responses before the ultimate decision is made by MERS. Considering the added procedural protections, Halstead has not shown that transferring the retirement system to MERS has substantially impaired the procedures relating to benefit determinations.

## 2. TAKINGS CLAUSE

Halstead alleges that the FERS dispute resolution process required under his CBA was a property right under the Michigan Constitution, and that the refusal to allow him to participate in that process constitutes an unconstitutional taking of a property right.

"Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2. The existence of a vested property right is essential to a claim that an uncompensated taking has occurred. As we explained in *Long v Liquor Control Comm*, 322 Mich App 60, 68; 910 NW2d 674 (2017):

> One who asserts an uncompensated taking claim must first establish that a vested property right is affected. Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. A vested property right is an interest that is more than a mere expectation. A vested property right requires a legitimate claim of entitlement based on something more than an anticipated continuance of the present general laws . . . . [Quotation marks and citations and alteration omitted.]

As an initial matter, we are not convinced that Halstead has a cognizable property interest in a contractually negotiated appeals process. Halstead notes that "a taking can, and often does, encompass more than just the physical deprivation of real, tangible property; it also includes the government's interference with one's personal, intangible property." *Rafaeli, LLC v Oakland Co*, 505 Mich 429, 455; 952 NW2d 434 (2020). It does not necessarily follow, however, that an appeals process is an intangible property interest for purposes of the Taking Clause, and Halstead offers no further support for this argument. In any event, assuming without deciding that Halstead had an intangible personal property right in having his pension benefit challenges heard and decided by FERS, that right was not vested for the reasons already discussed.

Further, Halstead, as a member of his union, voluntarily relinquished this alleged property interest, given that the union and the city entered into the memorandum of understanding on July 31, 2012, in which the union expressly agreed to the transfer of the retirement system to MERS and that challenges to the calculation of pension benefits would be heard and decided by MERS. In *AFT Mich*, 497 Mich at 218, the Supreme Court recognized that if a property owner voluntarily

relinquishes his or her rights, there is no taking under Const 1963, art 10, § 2. The Court further explained that "a property owner cannot give property to the government of his or her own volition, and then proceed to argue that the government must compensate the owner for that contribution." *Id*. at 219. The fact that Halstead may not have individually agreed to the transfer is irrelevant, given that as a union member he was bound by the decisions and agreements executed by the union. *Kempner*, 126 Mich App at 462 n 3. Accordingly, because Halstead's union voluntarily agreed that the retirement system would be transferred to FERS, and that any challenges with respect to the calculation of pension benefits would be heard and decided according to MERS's procedures, Halstead's argument that his personal property was taken by the state without just compensation in contravention of Const 1963, art 10, § 2, is not persuasive.

## E. STANDING

Finally, Halstead argues that MERS lacked standing to bring a declaratory judgment action.

A litigant has standing at the trial court level when a legal cause of action exists. *In re Knight*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket No. 346554); slip op at 3. "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MCR 2.605(A)(1). "An actual controversy exists when a declaratory judgment is necessary to guide the plaintiff's future conduct in order to preserve the plaintiff's legal rights." *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 545-546; 904 NW2d 192 (2017).

As MERS argues, once the FERS Board of Trustees and the emergency manager executed documentation to complete the transfer of the retirement system to MERS, it became the obligation of MERS to oversee, supervise, and administer the retirement system on behalf of the members of the retirement system. MERS has been carrying out this responsibility since 2012. If the trial court were to enter an order requiring that certain aspects of the retirement system be transferred back to FERS, this would impinge upon and undermine the authority of MERS to administer the retirement system. Under those circumstances, there was an "actual controversy" necessary for seeking declaratory relief. Therefore, Halstead's claim that MERS did not have standing to pursue a declaratory judgment is without merit.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Kathleen Jansen
/s/ Jane M. Beckering

-10-